**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| WILLIAM SHDEED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. CIV-15-181-D |
| ALTERRA EXCESS & SURPLUS COMPANY; and MARKEL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

**PIERCE COUCH HENDRICKSON BAYSINGER & GREEN, L.L.P.**
D. Lynn Babb (OBA #392)
Amy S. Neathery (OBA #20344)
1109 North Francis (73106)
Post Office Box 26350
Oklahoma City, OK 73126
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
lbabb@piercecouch.com
aneathery@piercecouch.com
*Attorneys for Defendants, Alterra Excess & Surplus Insurance Company and Markel Insurance Company*

TABLE OF CONTENTS

Table of Contents ........ i

Table of Authorities ........ ii-iv

Statement of the Case ........ 2

Statement of Undisputed Facts ........ 5

Summary Judgment Standard ........ 10

Markel Issued No Policies And Should Have Never Been Sued ........ 11

Alterra Excess & Surplus Insurance Company Is A
Surplus Lines Insurer Under Oklahoma Law ........ 12

There Is No Coverage Under The Contract of Insurance
For The Water Damage Claim Of November 17, 2014 ........ 14

Alterra Excess & Surplus Insurance Company Is Entitled To
Summary Judgment On Plaintiff's Bad Faith Claim Because
This Case Involves a Legitimate Dispute ........ 19

The Plaintiff Is Not Entitled To A Claim For Punitive Damages ........ 24

Conclusion ........ 27

# TABLE OF AUTHORITIES

## Cases

*Badillo v. Mid Century Ins. Co.*,
121 P.3d 1080, 1106 (Okla.2005) ....................................................................25

*Ballinger v. Security Conn. Life Ins. Co.*,
1993 OK 69, 862 P.2d 68, 70........................................................................20, 22

*Bedford Internet Office Space, LLC v. Travelers Cas. Ins. Co.*, 41 F. Supp. 3d 535, 548 (N.D. Tex. 2014)........................................... 18

*Bituminous Cas. Corp. v. Cowen Constr., Inc.,*
55 P.3d 1030, 1033 (Okla. 2002) ..................................................................... 14

*Branch v. Farmers Ins. Co.*,
311 F.3d 1241, 1243 (10 Cir. 2002)................................................................. 21

*Buzzard*, 824 P.2d at 1115................................................................................26

*Bryant v. Sagamore Ins. Co.*, 18 F. Supp. 3d 1245, 1249
(E.D. Okla. 2014) *aff'd,* 597 F. App'x 968 (10th Cir. 2015).................................. 15

*Certain Underwriters at Lloyds London v. B3, Inc.,*
262 P.3d 397, 400 (Okla.Civ.App. Div. 1 2011) ................................................ 15

*Christian v. American Homes Assurance Co.,*
1977 OK 141, 577 P.2d 899, 904 ................................................................ 20, 21

*Claborn v. Washington Nat'l Ins. Co.*,
1996 OK 8, 910 P.2d 1046, 1051..................................................................20, 21

*Conti v. Republic Underwriters Ins. Co.*,
1989 OK 128, 782 P.2d 1357, 1359-61 .........................................................20, 21

*Duckett v. Allstate Ins. Co.*,
606 F. Supp. 728, 731 (W.D. Okla. 1984)........................................................20, 22

*Goodwin v. Old Republic Ins. Co.*,
828 P.2d 431, 436 (Okla. 1992) ............................................................ 20

*Hallas v. Boehmke and Dobosz, Inc.*,
239 Conn. 658, 675 n. 16 (1997) ........................................................... 14

*Jacobson v. Maryland Cas. Co.*,
336 F.2d 72, 74 (8 Cir. 1964), certiorari denied
85 S.Ct. 655, 379 U.S. 964, 13 L.Ed.2d 558........................................................ 10

*Keating v. Edmondson*,
2001 OK 110, 37 P.3d 882, 886 (Okla. 2001)............................................... 13

*Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indem. Ins. Co.,*
462 Fed.Appx. 70 (2nd Cir.2012) ........................................................... 18

*London v. Trinity Cos.*,
1994 OK CIV APP 59, 877 P.2d 620, 622 ...............................................20, 22

*McLaughlin v. Nat'l Ben. Life Ins. Co.*,
772 P.2d 383, 386 (Okla.1988)...............................................................25

*Oakdale Mall Associates v. Cincinnati Ins. Co.*,
702 F.3d 1119, 1124 (8th Cir. 2013) ........................................................ 18

*Oulds v. Principal Mut. Life Ins. Co.*,
6 F.3d 1431, 1440 (10 Cir. 1993) ........................................................20, 21

*Quinn v. Syracuse Model Neighborhood Corp.*,
613 F.2d 438, 445 (2 Cir. 1980).............................................................11

*Rios v. Scottsdale Ins. Co.*,
119 Cal. App. 4th 1020, 1023-26 (2004).................................................... 13

*R. J. Longo Const. Co., Inc. v. Transit America, Inc.*, 921 F.Supp. 1295, 1303 (D. N.J. 1996) ........................................... 11

*Saiz v. Charter Oak Fire Ins. Co.,*
299 Fed.Appx. 836, 840 (10th Cir.2008).................................................... 18

*Sims v. Great American Life Ins. Co.,*
469 F.3d 870, 893-894 (10 Cir. 2006) ...........................................23, 25, 27

*Sims v. Travelers Ins. Co.*,
2000 OK CIV APP 145, 16 P.3d 468, 472 ........................................................ 21

*Skinner v. John Deere Ins. Co.*,
2000 OK 18, 998 P.2d 1219, 1223 ........................................................................21

*Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462
(10 Cir. 1989) (*quoting Manis v. Hartford Fire Ins. Co.*,
1984 OK 25, 681 P.2d 760, 762) ......................................................................21, 23

*Timmons v. Royal Globe Ins. Co.*,
653 P.2d 907, 917 (Okla.1982) ..............................................................................26

*Transfew Co. v. Insured Lloyds Co.*,
225 So.2d 284, 287-88 (La. Ct. App. 1969) ..................................................... 14

*Warner v. Hillcrest Med. Ctr.*,
1995 OK 123, 914 P.2d 1060, 1064 (Okla. Civ. App. 1995) .............................. 11

*Whitmire v. Mid-Continent Cas. Co.*,
1996 OK CIV APP 116, 928 P.2d 959, 962 .....................................................20, 22

<u>Statutes</u>

15 Okla. Stat. § 154.......................................................................................... 14

Okla. Stat. tit. 23, § 9.1(B), (D) (2005) ............................................................... 25

36 O.S. § 1435.2(19)......................................................................................... 13

36 O.S. § 1435.3(A) .......................................................................................... 13

36 O.S. § 1435.3(B) ...................................................................................... 12, 13

<u>Other Authorities</u>

Fed. R. Civ. P. 56(c)......................................................................................... 10

Come now the Defendants, Alterra Excess & Surplus Insurance Company ("Alterra") and Markel Insurance Company ("Markel"), and pursuant to FRCP, Rule 56, moves this Court to grant judgment in their favor and against the Plaintiff, in that there is no genuine dispute as to any material fact and these Defendants are entitled to judgment as a matter of law. In support hereof, the Defendants would refer the court to their Brief in Support below.

WHEREFORE, the Defendants, Alterra Excess & Surplus Insurance Company and Markel Insurance Company, respectfully request this Court grant judgment in their favor, that Plaintiff's action be dismissed and these Defendants discharged with their cost and attorney fees.

## BRIEF IN SUPPORT

## STATEMENT OF THE CASE

This lawsuit arises out of a claim for water damage discovered at 12201 Warwick Drive, Oklahoma City, Oklahoma ("the insured premises") on November 17, 2014. The insured premises are one of approximately 60 properties insured under a policy of insurance issued by Alterra to William Shdeed, Joseph Harroz and Carson & Shdeed, LLC. The contract of insurance, Policy No. MK LS13 XP 000655, had a policy period of September 8, 2014 to September 8, 2015. Mr. Shdeed, whose agent/surplus lines broker, C. L. Frates, submitted an application for insurance to AmWINS Group, Inc. AmWINS, in turn, submitted the application to Alterra who agreed to insure the properties.

On the morning of November 17, 2014, the Oklahoma City Fire Department was notified of water escaping from the front door of the insured premises. They responded and determined it was a private matter, however, did shut off the flow of water into the building. Mr. Shdeed's office was notified and they, in turn, dispatched Mr. Mike Carson to the same. Mr. Carson, through his company Carson & Shdeed, LLC, provides maintenance for those buildings owned by William Shdeed, Joseph Harroz and/or Carson & Shdeed, LLC.[1] Mr. Carson, upon arrival at the insured premises, discovered where water had escaped from the front door and, upon entering, discovered approximately a foot of water and mud throughout the vacant building.

The insured premises had at one time been a Walls Bargain Center. According to Mr. Carson and Mr. Shdeed, the property had been vacant for approximately five years, however, throughout that time, Mr. Shdeed had actively sought to lease the property, however, as of the date of the water damage, had been unsuccessful in doing so though he had had several prospects.

The insured premises are actually two buildings built to appear as one. The total square footage of the building was approximately 40,000 sq. ft., approximately 10,000 of which was occupied by a Dollar General Store and a restaurant, Italia Express. According to Mr. Shdeed, he had first acquired that portion of the insured premises in which Dollar General Store and Italia Express

[1] This action is brought only by William Shdeed because neither Joseph Harroz nor Carson & Shdeed, LLC have an ownership interest in the insured premises. See, Deposition of William Shdeed, pp. 18-19, Exhibit 2.

were occupied. He owned that location for some period of time before acquiring the vacant Walls building for $300,000.00 at auction.

Mr. Shdeed's office contacted their retail agent/surplus lines broker, C. L. Frates, who, in turn, submitted a claim to AmWINS Group. AmWINS notified Alterra, who assigned the claim to their claims examiner, Harvey Goodman. Mr. Goodman retained Johnson Claim Service, who assigned the matter to Eldon Huckabay. Mr. Huckabay inspected the property and determined the services of an engineer were necessary in order to establish the cause of loss. The original claim by Mr. Shdeed asserted the leak had been caused when an unknown vehicle had struck the protective barrier surrounding the fire department connection, located in the parking lot, approximately 60-70 feet away from the building. Questioning how a waterline inside the building could have been damaged in the fashion as theorized by Mr. Shdeed and Mr. Carson, Mr. Huckabay retained the services of Rimkus Consulting, who assigned Mr. Chad Williams to investigate. Mr. Williams determined that the cause of the leak was due to corrosion of the waterline supplying water to the valves controlling the sprinkler system within the vacated building. The corrosion had resulted in a hole in the line, located approximately 6-10 below the foundation of the building. Mr. Williams determined that the leak had nothing to do with the damage to the barrier in the parking lot.

Mr. Goodman, upon receipt of the engineering reports in mid-January, 2015, began an inquiry as to how long the property had been vacant prior to the

loss. He asked Huckabay to make contact with Carson and to check the Oklahoma County Assessor's records for further clarification. Carson told Mr. Huckabay to his knowledge the property had been vacant approximately two and one half years. This was verified by the Oklahoma County Assessor's records. Upon receipt of this information, Mr. Huckabay consulted with the Oklahoma City attorney, Tim Cheek, who assisted in drafting a Reservation of Rights letter that was forwarded to Mr. Shdeed on January 29, 2015. At that same time, in an effort to determine definitively if the vacancy exclusion in the policy was applicable, Mr. Huckabay was dispatched to interview Mr. Shdeed. When Mr. Huckabay contacted Mr. Shdeed, he was told that Mr. Shdeed had retained Tom Mullen to represent him and that Mr. Huckabay would need to contact Mr. Mullen. He attempted to do so during the month of February, 2015, however, once he was able to speak with Mr. Mullen, it was discovered that Mr. Mullen had already filed this lawsuit.

## STATEMENT OF UNDISPUTED FACTS

1. Alterra Excess & Surplus Insurance Company issued a commercial property policy of insurance, Policy No. MK LS13 XP 000655, having a policy period of September 8, 2014 to September 8, 2015. Exhibit 1.

2. The policy covers approximately 50 different commercial properties owned by William Shdeed, Joseph Harroz and/or Carson & Shdeed LLC. Exhibit 1, and Deposition of William Shdeed, Exhibit 2, p. 11-13.

3. Included in the properties insured was 12201 Warwick Drive, Oklahoma City, Oklahoma. Exhibit 1.

4. William Shdeed had owned the building at 12201 Warwick Drive for five years. Exhibit 2, p. 13.

5. For the entire time that William Shdeed had owned 12201 Warwick Drive, it had been vacant and unoccupied. Exhibit 2, p. 15.

6. Mr. Shdeed is in the business of leasing commercial real estate and for as long as he had owned 12201 Warwick Drive, he had attempted to lease it. Exhibit 2, pp. 21-22.

7. The policy of insurance contains the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, Form CP 00100607. Under the heading E. Loss Conditions, ¶ 6. Vacancy, the policy states:

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

Exhibit 1.

8. On the morning of November 17, 2014, water was discovered escaping from the front doors of 12201 Warwick Drive. Exhibit 3, Deposition of Mike Carson, p. 20.

9. Mr. Carson investigated and determined that the water had already been shut off by the Oklahoma City Fire Department and that there was mud and water in the building. Exhibit 3, pp. 37-38.

10. Mr. Carson also observed the barrier surrounding the fire department connection in the parking lot had been stricken by a vehicle and he presumed that is what caused the water intrusion. Exhibit 3, pp. 30-31.

11. Mr. Shdeed's office contacted their agent, C. L. Frates, who in turn contacted AmWINS Group and they contacted Alterra. Exhibit 3, Deposition of Mike Carson, pp. 35-38; Exhibit 2, Deposition of William Shdeed, p. 11.

12. Alterra assigned the claim to Mr. Harvey Goodman, a claims examiner with Markel Service, Inc., Exhibit 4, Deposition of Harvey Goodman, pp. _____.

13. Mr. Goodman retained Johnson Claim Service to physically inspect the property and they assigned the job to Eldon Huckabay. Exhibit 4, pp. _____; Exhibit 5, Deposition of Eldon Huckabay, p. 68.

14. Mr. Huckabay contacted Mr. Shdeed's office and first inspected the property on November 20, 2014. Exhibit 5, p. 21.

15. Though he was told by Mr. Carson that the cause of the water line break was the barrier being struck in the parking lot, Mr. Huckabay retained Rimkus Consulting to determine the cause of the water break. Exhibit 5, pp. 25-28.

16. Rimkus assigned engineer, Chad Williams, to the claim and he inspected the property on December 1, 3 and 8, 2014. Exhibit 6, Report of Rimkus Consulting Group dated December 9, 2014; Exhibit 7, Deposition of Chad Williams, pp. 12, 30, 36.

17. Mr. Williams determined that the cause of the water leak was a hole that had developed, due to corrosion, in the water supply line to the sprinkler system. Exhibit 6; Exhibit 7, pp. 47-28.

18. Mr. Goodman received Mr. Williams' report on January 14, 2015. Exhibit 4, pp. _____.

19. Upon review of Mr. Williams' report, Mr. Huckabay was asked to further investigate the vacancy of the building. Exhibit 5, Deposition of Eldon Huckabay, pp. 52-53, 79.

20. Mr. Huckabay spoke with Mr. Carson and told him the building had been vacant for two and a half years. Exhibit 8, e-mail from Eldon Huckabay to Harvey Goodman, dated January 22, 2015.

21. Mr. Huckabay also obtained records from the Oklahoma County Assessor's office indicating that the vacant portion of the building comprised approximately 30,000 sq. ft. of the total 40,000 sq. ft. Exhibit 9, e-mail from Eldon Huckabay to Harvey Goodman dated January 22, 2015 with attached documentation from the Oklahoma County Assessor.

22. Mr. Goodman retained Oklahoma City lawyer, Tim Cheek, who prepared a Reservation of Rights letter to Mr. Shdeed. Exhibit 4, pp. _____.

23. The Reservation of Rights letter informed Mr. Shdeed of all possible provisions of the policy that might be applicable to the claim. Exhibit 4, pp. _____; Exhibit 10, Reservation of Rights Letter.

24. Mr. Huckabay was asked to obtain a statement from Mr. Shdeed to further clarify the vacancy of the property. Exhibit 5, p. 52.

25. Mr. Huckabay contacted Mr. Shdeed but was told that Mr. Shdeed had retained Tom Mullen to represent him and that any arrangement for a statement would have to be made through Mr. Mullen. Exhibit 5, p. 52.

26. Mr. Huckabay attempted to contact Mr. Mullen several times during the month of February 2015 and when he was finally able to speak with him, Mr. Mullen informed him that the lawsuit had already been filed and Mr. Shdeed would not be giving a statement. Exhibit 5, pp. 52-53.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56(c) when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The goal of summary judgment is to allow the trial court to dispose of a case in advance of a hearing on the merits, when the moving party is entitled to judgment as a matter of law. *Jacobson v. Maryland Cas. Co.*, 336 F.2d 72, 74 (8 Cir. 1964), certiorari denied 85 S.Ct. 655, 379 U.S. 964, 13 L.Ed.2d 558. Properly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to

meritless litigation. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2 Cir. 1980). Summary judgment is not a disfavored procedural shortcut, but rather an essential thread in the fabric of the federal rules. *R. J. Longo Const. Co., Inc. v. Transit America, Inc.*, 921 F.Supp. 1295, 1303 (D. N.J. 1996). In this case, the facts establish that Alterra Excess & Surplus Insurance Company is entitled to judgment as a matter of law, and the Court should grant partial summary judgment on the Plaintiff's claim of the breach of the duty of good faith and fair dealing to eliminate the Plaintiff's unfounded claims without recourse to a costly and lengthy trial.

**MARKEL ISSUED NO POLICIES AND SHOULD HAVE NEVER BEEN SUED**

It is undisputed that "Markel" is neither a parent company of Alterra nor did it issue the insurance policy involved in this case. It was not the entity that investigated and handled Mr. Shdeed's insurance claim. Both Harvey Goodman, the claim examiner responsible for Shdeed's claim, up to the filing of suit, and Keith Eggland, his original supervisor on this claim, have testified they were employed by Markel Services Inc. and NOT Markel Insurance Company. [Exh. 6, Deposition of Harvey Goodman, taken September 30, 2015, citation to be provided upon receipt of the transcript and Exhibit 10, Deposition of Keith Eggland, p. 5] Plainly stated, Markel Insurance Company had nothing to do with Mr. Shdeed's claim. Markel should not have been named as a defendant. Markel is entitled to summary judgment. *See Warner v. Hillcrest Med. Ctr.*, 1995

OK 123, 914 P.2d 1060, 1064 (Okla. Civ. App. 1995) ("There is a duty to dismiss lawsuits when it becomes apparent there is no viable claim against a named defendant.").

**ALTERRA EXCESS & SURPLUS INSURANCE COMPANY IS A SURPLUS LINES INSURER UNDER OKLAHOMA LAW.**

It is important to the inquiry that the policy here is a commercial property policy issued through the non-admitted Surplus Lines marketplace. Like most states, Oklahoma's Insurance Code distinguishes between admitted insurance policies and Surplus Lines policies. Under Oklahoma's Surplus Lines law, Frates was Shdeed's agent and representative in procuring coverage. .

This is a distinct feature of Surplus Lines insurance law. In this regard, an Oklahoma statute aptly titled "Agency Status of Agent – Authority" governs the relationship between Frates and Shdeed. See 36 O.S. § 1435.3(B). The statute provides:

> Every **surplus lines insurance broker** who solicits an application for insurance of any kind shall, in any controversy between the insured or the insured's beneficiary and the insurer issuing any policy upon such application, be **regarded as representing the insured** or the insured's beneficiary ***and not the insurer***.

36 O.S. § 1435.3(B) (emphasis added).

Accordingly, pursuant to the statute, Frates -- as the Surplus Lines broker[2] -- was deemed to exclusively represent Shdeed, and not the insurer because the policies were issued in the surplus lines market.[3]

Applied to the facts here, Shdeed used Frates as its Surplus Lines broker. Under 36 O.S. § 1435.3(B), Frates thus represented Shdeed. Under no circumstance can Frates bind Alterra. The statutes are clear. The most sacred tenet of statutory construction is that a court must "presume that the Legislature expressed its intent and that it intended what it expressed." *Keating v. Edmondson*, 2001 OK 110, 37 P.3d 882, 886 (Okla. 2001). Unless the Court committed the error of disregarding the Legislature's mandate regarding the issuance of Surplus Lines policies in Oklahoma, as a matter of law, Shdeed cannot prevail on its vicarious liability theory against Alterra. The Legislature's intent regarding the treatment of Surplus Lines brokers is unmistakable.

This action is controlled by Oklahoma law, but the outcome would be identical in other states. *See, e.g., Rios v. Scottsdale Ins. Co.*, 119 Cal. App. 4th 1020, 1023-26 (2004) (insured's representative's "mistaken representation within

---

[2] See definitions, 36 O.S. § 1435.2(19).

[3] The statute addresses the admitted market separately, in Section 1435.3(A), wherein it states:

> Every insurance producer … who solicits or negotiates an application for insurance of any kind shall, in any controversy between the insured or the insured's beneficiary and the insurer, be regarded as representing the insurer and not the insured or the insured's beneficiary...

36 O.S. § 1435.3(A). This subsection has no applicability to the case at hand since the subject policies were surplus lines policies.

the binder that the policy was a 'Special Form' policy cannot be imputed to Scottsdale [the insurer] or UCA [its representative])"; *Hallas v. Boehmke and Dobosz, Inc.*, 239 Conn. 658, 675 n. 16 (1997) (distinguishing between insured's representative and insurer's representative because "[t]o do otherwise would effectively make agents out of all independent insurance brokers."); *See, Transfew Co. v. Insured Lloyds Co.*, 225 So.2d 284, 287-88 (La. Ct. App. 1969) (distinguishing between insured's representative and insurer's representative for purposes of notice).

**THERE IS NO COVERAGE UNDER THE CONTRACT OF INSURANCE FOR THE WATER DAMAGE CLAIM OF NOVEMBER 17, 2014**

In Oklahoma, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." 15 Okla. Stat. § 154. When the policy language is clear and unambiguous, "the employed language is accorded its ordinary, plain meaning and enforced so as to carry out the parties' intentions." *Bituminous Cas. Corp. v. Cowen Constr., Inc.,* 55 P.3d 1030, 1033 (Okla. 2002). The court is to be "mindful that an insured and insurer are free to contract for that quantum of coverage which one is willing to extend and the other is willing to purchase." *Id.*

The parties are bound by the terms of the policy, and the Court will not rewrite it "to make for either party a better contract than the one which was executed." *Id.* "Courts must not torture the policy language in order to 'create ambiguities where none exist'." *Id.* at 1035 (citation omitted). "The rule that

policies are to be construed against the insurer has no application where the provisions are susceptible of only one reasonable construction." *Certain Underwriters at Lloyds London v. B3, Inc.,* 262 P.3d 397, 400 (Okla.Civ.App. Div. 1 2011); *Bryant v. Sagamore Ins. Co.*, 18 F. Supp. 3d 1245, 1249 (E.D. Okla. 2014) *aff'd,* 597 F. App'x 968 (10th Cir. 2015)

The key provision within the policy of insurance is found in the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, Form CP 00100607. Under the heading E. Loss Conditions, ¶ 6. Vacancy, the policy states:

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

Water damage is defined in the policy under CAUSES OF LOSS - SPECIAL FORM, Form CP 10 30 06 07 on page 10 of 10, under the heading G. Definitions:

2. "Specified causes of loss" means the following: fire; lightening; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

...

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts) that is located on the described premises and contains water or steam.

It is undisputed that the building at 12201 Warwick Drive sustained water damage. See, Exhibits 2, 7 and 8. It is further undisputed that at the time of the water line break, that portion of the building in which the water damage occurred comprised 30,000 sq. ft. of the combined building, having only a total of 40,000 sq. ft.[4] See, Commercial Insurance Application. Exhibit 11; Records of Oklahoma County Assessor's Office, Exhibit 8.

Therefore, only 25% of the building was "[r]ented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations." Further, Mr. Shdeed did not use the vacant space "to conduct customary operations." See, Deposition of Mike Carson, Exhibit 3, p. 10; Deposition of William Shdeed, Exhibit 2, p. 15.

Further, the undisputed evidence has shown that this building had been vacant for more than 60 consecutive days preceding the date of loss. In fact, the building had been vacant for several years. See, Deposition of Mike Carson, Exhibit 3, p. 10; Deposition of William Shdeed, Exhibit 2, p. 15.

[4] Mr. Shdeed claims 12202 Warwick Drive is a separate building from 12203-12205. Exhibit 2, Deposition of William Shdeed, p. 13. If considered a separate building then there is no question it was completely empty for at least sixty (60) consecutive days before the water line broke. Alterra has taken the structure as listed on the policy, 12202-12205 Warwick Drive for purposes of determining vacancy.

The clear and unambiguous language of the policy when applied to these facts indicate that there was no coverage for the water claim submitted by Mr. Shdeed. "[T]he policy was unambiguous and that the summary judgment evidence establishes beyond peradventure that neither Plaintiff nor its lessee was using the insured property to conduct customary operations within sixty days preceding the date of the loss. Accordingly, Defendant is entitled to summary judgment on its affirmative defense that Plaintiff's claims were excluded or limited by the terms of the insurance policy." *Bedford Internet Office Space, LLC v. Travelers Cas. Ins. Co.*, 41 F. Supp. 3d 535, 548 (N.D. Tex. 2014).See, *Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indem. Ins. Co.,* 462 Fed.Appx. 70 (2nd Cir.2012); *Saiz v. Charter Oak Fire Ins. Co.,* 299 Fed.Appx. 836, 840 (10th Cir.2008). Though Mr. Shdeed was attempting to lease the property, that is not sufficient to defeat the vacancy provision. Under Oakdale's interpretation of the policy—"[a] shopping center may not be 'vacant' if the owner is trying to rent the space"—the mall could be completely vacant, but would be deemed fully occupied for purposes of the vacancy provision if the owner simply posted a sign outside or placed an advertisement online or in the newspaper. Oakdale's interpretation is unreasonable, bordering on the absurd." *Oakdale Mall Associates v. Cincinnati Ins. Co.*, 702 F.3d 1119, 1124 (8th Cir. 2013).

Alterra Excess and Surplus Insurance Company and Markel Insurance Company are, therefore, entitled to judgment in their favor on plaintiff's claim for breach of contract.

It is expected that Plaintiff will argue that Alterra and Markel knew of the building's vacancy, issued the policy anyway, and that the policy should be enforced without consideration of the vacancy reference because, if not, the policy is illusory. However, that argument fails.

First there is no evidence that Alterra knew or had knowledge that the insured premises were vacant. Plaintiff asserts the property was inspected by Alterra, however, Alterra in responding to written discovery has stated no such inspection of 12201 Warwick Drive was performed. See Exhibit 13, Response to Request for Production No. 7, in which Alterra indicated it had no inspection reports for the insured premises.

Further, the vacancy provision only applies to specific enumerated perils (i.e., vandalism, water damage, or theft). Even with the building being vacant, the policy still provides coverage for a number of other causes of loss such as tornado or hail. Thus, the policy still provided value to Mr. Shdeed. However, the plain terms of the policy demonstrate that there is no coverage for water damage to a vacant building; there is no dispute that the building was vacant, and, therefore, there is no coverage under the policy for this peril.

**ALTERRA EXCESS & SURPLUS INSURANCE COMPANY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' BAD FAITH CLAIM BECAUSE THIS CASE INVOLVES A LEGITIMATE DISPUTE.**

The reasonableness of an insurance company's decision not to pay all or part of an insured's claim may be determined as a matter of law. *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1437 (10 Cir. 1993). Applying the principles of good faith and fair dealing, Oklahoma courts have not hesitated to find, *as a matter of law*, that the insurer did not act in bad faith where there was a reasonable basis for its actions.[5] In this case, there is a legitimate dispute as to whether the water damage to the insured premises was a covered loss, and Alterra Excess & Surplus Insurance Company is entitled to judgment as a matter of law. In C*hristian v. American Homes Assurance Co.,* 1977 OK 141, 577 P.2d 899, 904, the Oklahoma Supreme Court held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort . . . ." *Id.* at 904. The Court made clear, however, that it was not holding that an insurer who resists or litigates a claim made by its insured does so at its peril. Rather, the Court stated:

[5] *Claborn v. Washington Nat'l Ins. Co.*, 910 P.2d 1046, 1051 (Okla. 1996) (trial court erred as a matter of law in submitting bad faith claim to jury where insurer's denial of claim based on a legitimate dispute); *Ballinger v. Security Conn. Life Ins. Co.*, 862 P.2d 68, 70 (Okla. 1993) (summary judgment in favor of insurer on bad faith claim properly granted where plaintiff's allegations "boil[ed] down to the fact that defendant defended the lawsuit when plaintiff had believed they would not do so."); *Goodwin v. Old Republic Ins. Co.*, 828 P.2d 431, 436 (Okla. 1992) (affirming summary judgment in favor of insurer on bad faith claim where insurer had reasonable grounds for denying workers compensation claim); *Whitmire v. Mid-Continent Cas. Co.*, 928 P.2d 959, 962 (Okla. Ct. App. 1996) (summary judgment properly granted as to bad faith claim where insurer had reasonable ground for contesting coverage); *London v. Trinity Cos.*, 877 P.2d 620, 622 (Okla. Ct. App. 1994); *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1360 (Okla. 1989) (trial court erred in submitting bad faith and punitive damages issues to jury where there was a bona fide dispute as to who was responsible for arson which destroyed the insured's home); *Duckett v. Allstate Ins. Co.*, 606 F. Supp. 728, 731 (W .D. Okla. 1984) (summary judgment granted in favor of Allstate on bad faith claim where there was no controlling decision on the coverage issue).

> We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions . . . Tort liability may be imposed only where there is a clear showing that the insurer unreasonably and in bad faith, withholds payment of the claim of its insured.
> *Id.* at 905.

Numerous Oklahoma cases since *Christian* have held that "[t]he insurer does not breach this duty [of good faith] by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate'." *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10 Cir. 1989) (*quoting Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, 681 P.2d 760, 762); *see also Conti v. Republic Underwriters Ins. Co.*, 1989 OK 128, 782 P.2d 1357, 1359-61; *Claborn v. Washington Nat'l Ins. Co.*, 1996 OK 8, 910 P.2d 1046, 1051 (trial court erred as a matter of law in submitting bad faith claim to jury where denial of claim was based upon a legitimate dispute); *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1440 (10 Cir. 1993) ("No reasonable inference of bad faith arises from the insurer's withholding payment based on a legitimate dispute."); *Branch v. Farmers Ins. Co.*, 311 F.3d 1241, 1243 (10 Cir. 2002) (directing trial court to enter judgment for Farmers on plaintiff's bad faith claim, "[b]ecause Farmers' interpretation of the actual cash value provision was a reasonable position taken in litigation of a legitimate coverage dispute . . . ."); *Sims v. Travelers Ins. Co.*, 2000 OK CIV APP 145, 16 P.3d 468, 472 (grant of partial summary judgment on plaintiff's bad faith

claim arising out of valuation of plaintiff's UIM claim was appropriate because "[a] bad faith action will not lie where there is a legitimate dispute").

Alterra's efforts to determine if Mr. Shdeed's claim was covered under the policy, simply cannot give rise to a claim for breach of the duty of good faith and fair dealing under extant Oklahoma law. In *Skinner v. John Deere Ins. Co.*, 2000 OK 18, 998 P.2d 1219, 1223, the Court found that "[b]ecause disagreements can arise concerning the amount of coverage, cause of loss, and breach of policy conditions, the tort of bad faith does not prevent the insurer from resisting payment or resorting to a judicial forum to resolve a legitimate dispute." *See also, Ballinger v. Security Conn. Life Ins. Co.*, 1993 OK 69, 862 P.2d 68, 70 (summary judgment in favor of insurer properly granted where plaintiff's allegations "boil[ed] down to the fact that defendant defended the lawsuit when plaintiff had believed they would not do so."); *Whitmire v. Mid-Continent Cas. Co.*, 1996 OK CIV APP 116, 928 P.2d 959, 962 (summary judgment properly granted where insurer had reasonable ground for contesting coverage); *London v. Trinity Cos.*, 1994 OK CIV APP 59, 877 P.2d 620, 622; *Conti*, 1989 OK 128, 782 P.2d 1357, 1360 (trial court erred in submitting bad faith and punitive damages issues to jury where there was a bona fide dispute as to who was responsible for arson); *Duckett v. Allstate Ins. Co.*, 606 F. Supp. 728, 731 (W.D. Okla. 1984) (summary judgment granted in favor of Allstate where there was no controlling decision on anti-stacking provisions). A legitimate dispute exists when an insurance company has a reasonable basis for its interpretation of the

facts and policy, and there is no controlling authority directing the insurance company to do otherwise. *See Thompson*, 875 F.2d at 1462.

In *Sims v. Great American Life Ins. Co.,* 469 F.3d 870 (10 Cir. 2006), the Tenth Circuit considered whether this Court properly submitted a claim for bad faith to the jury. In finding that, as a matter of law, there was no bad faith conduct by the insurer, the Tenth Circuit first examined whether the insurer had a legitimate basis to deny coverage. The Tenth Circuit found that there were two plausible interpretations of the factual events that led to the claim for policy benefits (i.e., Mr. Sims died because of an unintended and tragic accident or his death was the result of suicide). Because the insurer presented ample evidence to suggest Mr. Sims' death was by suicide and the insurer could reasonably rely on such evidence when making its preliminary decision to dispute coverage, the Court found there was a legitimate dispute concerning coverage.

Based on the finding of a legitimate dispute, the Tenth Circuit found that additional evidence of bad faith would be required for the bad faith claim to survive a motion for judgment as a matter of law. *Id.* at 892. The Court then examined the investigation conducted by the insurer compared with that requested by the insureds. Because any further investigation would not necessarily lead to a different conclusion nor negate the evidence the insurer had regarding the cause of Mr. Sims' death, the Tenth Circuit found "the district court improperly submitted the issue of bad faith to the jury." *Id.* at 893.

In this case, Alterra, upon receiving notice, immediately dispatched Eldon Huckabay to investigate the claim. When it was clear that there was a question as to the cause of the water leak, Mr. Huckabay, at the request of Alterra, retained Rimkus Consulting. Their engineer, Chad Williams, determined the cause of the leak was due to long-term corrosion of the water supply line, not the damage to the barrier surrounding the fire connection in the parking lot. At that time, the investigation turned to whether the conditions found at the scene met the criteria of the vacancy provision. Though information from Mr. Carson and from the Oklahoma County Assessor's office indicated the property had been vacant for several years, Alterra, in an effort to give the benefit of the doubt to Mr. Shdeed, sought to question him more fully on that topic. Rather than provide the information, Shdeed chose to file this lawsuit 95 days after the loss occurred and only 90 days after Alterra began its investigation.

The issues in this case mirror those presented to the Tenth Circuit in *Sims*. Specifically, the insurers in both cases conducted an investigation and made a determination as to which one of two plausible interpretations of the factual events leading to the claim actually occurred. Even **if** the interpretation were incorrect, the fact that the interpretation is based on ample evidence supporting a plausible interpretation means a legitimate dispute exists and the bad faith claim must fail as a matter of law.

Based on all this evidence, it was more than reasonable for Alterra Excess & Surplus Insurance Company to take the position that the insured premises had

been vacant for 60 consecutive days immediately preceding the loss. Thus, it cannot be said that the information presented to Alterra Excess & Surplus Insurance Company was insufficient for a finding that a legitimate dispute existed as to the nature of the claim made. As such, there can be no finding of bad faith because Alterra Excess & Surplus Insurance Company was faced with this legitimate dispute as to coverage and chose to litigate the same, and the Court should grant summary judgment to Alterra Excess & Surplus Insurance Company on the Plaintiff's claim of the breach of the duty of good faith and fair dealing.

**THE PLAINTIFF IS NOT ENTITLED TO A CLAIM FOR PUNITIVE DAMAGES.**

Even though the Tenth Circuit in *Sims v. Great American Life Ins. Co.*, 469 F.3d 870 (10th Cir. 2006) already found, as a matter of law, there was no cause of action for bad faith, the Court nevertheless examined when a court may submit punitive damages to a jury. In finding that punitive damages would not have been appropriately submitted to the jury even if the bad faith claim survived summary judgment, the Tenth Circuit in *Sims* stated, "Punitive damages are awarded 'only when the evidence plainly shows oppression, fraud, malice, or gross negligence.'" *McLaughlin v. Nat'l Ben. Life Ins. Co.*, 772 P.2d 383, 386 (Okla.1988) (quotation omitted). Stated differently, an insurer must "recklessly disregard" or "intentionally and with malice breach its duty to deal fairly and act in good faith with its insured." Okla. Stat. tit. 23, § 9.1(B), (D) (2005); see *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1106 (Okla.2005).

The evidence in this case plainly does not support this conclusion. In addition to the evidence supporting its claim denial, Great American did not engage in conduct that has supported punitive damages in other cases. It did not falsify any documents. See, e.g., *Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 917 (Okla.1982). Nor did it offer to settle the claim if Mrs. Sims fired her counsel. See, e.g., *Id*. Great American did not simply deny coverage based on skeletal information. It hired an experienced, independent claim investigation agency to review the evidence and interview witnesses. The investigator reviewed Sims' medical and pharmaceutical history, interviewed numerous individuals with knowledge of the accident, and obtained relevant documentation from government officials. See, e.g., *Buzzard*, 824 P.2d at 1115 ("Farmers was notified of the claim the day after the accident but failed to conduct any investigation.")

Great American remained steadfast in its reasoning for denying the claim. It never argued that the denial was appropriate for any reason other than the alleged suicide. See, e.g., *Id*. ("At trial, [the insurer] raised the issue of [the insured's] negligence, asserting that denial of the claim was based on [this negligence]. However, nowhere in [the insurer's] file was comparative negligence mentioned as a reason for denial."). Finally, Great American did not attempt to conceal the identity of its investigator or obtain confidential information without Mrs. Sims' permission. See, e.g., *Timmons*, 653 P.2d at 917. In short, because we find that the evidence does not support a finding of bad faith, we also cannot affirm a finding of punitive damages. Even were we to have affirmed the jury's finding on

bad faith, Great American's conduct does not demonstrate the elements of fraud or evil intent to which punitive damages are directed. We, therefore, find no legally sufficient evidentiary basis for a reasonable jury to award punitive damages.

*Sims* at 893-4.

In this case, there is likewise no evidentiary basis for a reasonable jury to award punitive damages. Nothing in the record demonstrates oppression, fraud, malice, or gross negligence by Alterra Excess & Surplus Insurance Company. Alterra Excess & Surplus Insurance Company's conduct was neither in reckless disregard of the Plaintiff nor did it act intentionally and with malice. Alterra Excess & Surplus Insurance Company did not falsify documents, offer to settle if the Plaintiff terminated his counsel, nor deny coverage based on skeletal information but used an experienced field adjuster and independent engineer to obtain and review the evidence. Further, Alterra Excess & Surplus Insurance Company did not attempt to conceal the identity of its investigator or obtain confidential information without Plaintiff's permission. Alterra merely sought to obtain information to determine if the vacancy provision was applicable. It was Mr. Shdeed's decision to file suit three months after the date of loss occurred. Therefore, consistent with the Tenth Circuit's ruling in *Sims*, the Plaintiff's claim for punitive damages should fail as a matter of law.

## CONCLUSION

There is no controversy as to any material fact in this case and those facts indicate Alterra Excess & Surplus Insurance Company and Markel Insurance

Company are entitled to judgment as a matter of law. The policy of insurance issued by Alterra to Mr. Shdeed did not provide coverage for water damage if the property had been vacant for at least 60 consecutive days preceding the loss. The facts indicate the insured premises had been vacant for at least two and one half years before the loss. Further, Alterra had a reasonable basis for questioning coverage and when plaintiff filed suit only 95 days after the loss occurred, Alterra had not been able to complete its investigation. There is no evidence to support a claim of failure to deal fairly and in good faith and that claim should be dismissed.

Respectfully submitted,

PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P.

s/*D. Lynn Babb*
D. Lynn Babb (OBA #392)
Amy S. Neathery (OBA #20344)
1109 North Francis (73106)
Post Office Box 26350
Oklahoma City, OK 73126
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
lbabb@piercecouch.com
aneathery@piercecouch.com
*Attorneys for Defendants, Alterra Excess & Surplus Insurance Company and Markel Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of October, 2015, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Tom E. Mullen
FENTON, FENTON, SMITH, RENEAU & MOON
211 North Robinson, Suite 800N
Oklahoma City, OK 73102
*Attorney for Plaintiff*

s/*D. Lynn Babb*
D. Lynn Babb / Amy S. Neathery